## In re MORRISVILLE CONCRETE PRODUCTS CO.

District Court, D. New Jersey.
March 29, 1934.

Homan, Buchanan & Smith, of Trenton, N. J., for petitioner.

Samuel D. Lenox, of Trenton, N. J., for trustee.

FORMAN, District Judge.

Petitioner, Marion E. Murray, was a stockholder in the above bankrupt corporation. Pursuant to an agreement dated April 5, 1923, she sold forty shares of stock so held by her to the corporation for the sum of $4,-000. The company failed to pay her. Property of the bankrupt being situated in Pennsylvania, on May 20, 1924, she sued out a writ of foreign attachment, and the property of the company was levied upon by the sheriff of Bucks county.

On or about November 10, 1924, the company filed its voluntary petition in bankruptcy, was adjudicated, and due proceedings were had which resulted in the sale of the property of the bankrupt by its trustee on April 7, 1925.

On May 26, 1925, judgment was entered against the company in the said foreign attachment proceedings in favor of the petitioner in the sum of $3,609.24. The petitioner herein then filed her petition praying that the trustee be directed to pay to her out of the proceeds of the sale of the said property the sum of $3,609.24, alleging that she had no notice of the bankruptcy proceedings.

Testimony was taken before the referee on petitioner's claim. It appears therefrom that in 1923 the company bought from her ten shares of stock for which it gave its note in the sum of $1,000 with an indorser thereon. This note was subsequently paid by the indorser. An agreement was also entered into for the purchase of forty shares for $4,000 and pursuant thereto she tendered the forty shares to the corporation. She was not an officer or director of the corporation but was represented in her dealings with it by her father, George Murray, who had no official connection with the company. At the time of the agreement aforesaid the corporation was insolvent, one of the witnesses alleging that it owed as much as $92,000. (See Lecompte's testimony Record, pp. 32 and 33.) Petitioner advances as the reason for the company's purchase of her stock that one, Lecompte, then a director and stockholder of the company agreed to advance further funds to the corporation providing her father, George Murray, could be eliminated from the affairs of the company, although it is not clear from the testimony what position he held in the same, if any. He seems to have acted only as the agent of his daughter, who was a stockholder. In any event, after the agreement Lecompte did advance to the company various sums until he had paid some $27,000 into the company, which was used for "pay-rolls and some was paid on claims the sheriff made for bills, and some was paid for remodelling the plant, but it was not paid at any one time—it was in dribs and drabs." (Rec. p. 35.)

On May 20, 1924, Miss Murray attached the property of the company, and the sheriff of Bucks county, Pa., placed her father in

charge thereof. After the attachment, there was paid to her the sum of $666.66 in two monthly payments of $333.33 each. These payments were made by checks of Ross & Whelen, a contracting firm, who purchased materials from the company and their checks were indorsed by the company over to Miss Murray. This was apparently accomplished through the permission granted by George Murray to the company to operate the machinery under attachment. In fact the witness Biddle, the president of the company, says, in his testimony, that Murray agreed to release the attachment altogether and promised to arrange such a release with the sheriff. This is contradicted by Murray. The company did, however, function until the November following the attachment and then filed its petition in bankruptcy. The trustee took possession of the property and sold it the following April (1925). He says in his answer in the proceedings before the referee that he had no notice of the attachment and that the sheriff was not in possession of the same at the time he took it over. After this sale, to wit, on May 26, 1925, Miss Murray took judgment against the company, which had then been adjudicated a bankrupt over six months prior to that date. Thereupon on September 15, 1925, Miss Murray sought to obtain a priority payment of her judgment in the bankruptcy proceedings by filing her petition with the referee.

The referee denied the petition in an order dated April 4, 1929, which order she now seeks to review by her petition filed April 13, 1929. The referee's certificate thereon was filed June 10, 1932.

■ Under the New Jersey Corporation Act (2 Comp. St. N. J. 1910, p. 1595 et seq., § 1 et seq. and Comp. St. Supp. N. J. § 47—3 et seq.), there is an implied grant of power to corporations to purchase shares of their own capital stock, whenever such purchase is required for legitimate corporate purposes.

"In England the general rule seems to be that corporations cannot purchase their own stock without express authority from the statute, though perhaps even there this rule would not be applied if it appeared that the object of the purchase was not merely to traffic in the stock or to diminish the amount of the capital, but to accomplish some legitimate corporate purpose. Hope v. International Financial Society, 4 Ch. Div. 327. But in the United States the weight of authority seems to be in favor of the view that corporations have an implied power to purchase shares in their own capital stock, provided, of course, no illegitimate design appears. Many of the cases are cited in the notes of 23 Am. & Eng. Enc. Law, 676.

"This question, as it turns on common-law principles, seems not to have been judicially decided in New Jersey, nor need it now be; for the provisions of our corporation act (P. L. 1896, p. 277 [2 Comp. St. 1910, p. 1595 et seq.]), by which (section 20) the shares of stock in every corporation are declared to be personal property, and (section 1) every corporation is vested with power to purchase such personal estate as the purposes of the corporation shall require, except (section 3) certain designated sorts of personal property, which do not embrace shares of its own capital stock, coupled with those provisions which recognize the power of corporations to own shares of their own capital stock (sections 29, 38), plainly imply a legislative grant of the necessary power in all cases where the purposes of the corporation require it." Chapman v. Ironclad Rheostat Co., 62 N. J. Law 497 at page 498, et seq., 41 A. 690.

"* * * Since the decision by the Supreme Court in Chapman v. Ironclad Rheostat Co., 62 N. J. Law [33 Vr.] 497, 41 A. 690, approved by the Court of Errors and Appeals in Berger v. United States Steel Corporation [63 N. J. Eq. 809], 53 A. 68 (1902), it is the settled law of this state that corporations may purchase shares of their own capital stock whenever such purchase is required for legitimate corporate purposes. I do not suppose that this decision goes the length of authorizing a corporation to purchase and pay for its own stock if such purchase and payment will disable it from paying its debts in full, or of authorizing a corporation to contract with one or more of its shareholders to buy shares and so convert them into creditors entitled to come in on an equality with other creditors, if the assets be at the time insufficient to pay all the creditors in full." Oliver v. Rahway Ice Co., 64 N. J. Eq. p. 596, 54 A. 460, cited with approval in Knickerbocker Importation Co. v. Assessors, 74 N. J. Law, 583 at page 586, 65 A. 913, 7 L. R. A. (N. S.) 885.

■ There is no question that the company was hopelessly insolvent at the time it agreed to purchase Miss Murray's stock. The best proof of the fact that it continued in such a state is demonstrated by its inability to pay her and its rapid drift into the bankruptcy court.

The referee was correct in his findings that this stock purchase was not made by the corporation for legitimate corporate purposes, even in the face of the allegation that the consummation of the arrangement resulted in Lecompte's advancement of further capital, to the perhaps temporary advantage of the company.

Under section 47a (2) of the Bankruptcy Act (11 USCA § 75 (a) (2) the status of the title of a trustee is fixed in the following language:

" * * * And such trustees, as to all property in the custody or coming into the custody of the bankruptcy court, shall be deemed vested with all the rights, remedies, and powers of a creditor holding a lien by legal or equitable proceedings thereon; and also, as to all property not in the custody of the bankruptcy court, shall be deemed vested with all the rights, remedies, and powers of a judgment creditor holding an execution duly returned unsatisfied."

Whether or not George Murray agreed to release the attachment is a matter of dispute. Nevertheless it remains a fact that there was a virtual abandonment of the same because the company did actually do business with the attached equipment during the two months following the attachment and was apparently free to go on with the same without any hindrance from the sheriff or Murray up to the time the trustee took possession of it.

The judgment under the attachment did not in fact follow until a month after the trustee had disposed of the property in April of 1925.

Under these circumstances there appears no error in the finding of the referee and his order will be affirmed.